[No. 1663.]

## P. A. McKENZIE, APPELLANT, *v.* GEORGE COSLETT, RESPONDENT.

MINING PARTNERSHIPS—RIGHTS AND LIABILITIES OF PARTNER.

1. Plaintiff and defendant formed a partnership, agreeing to be equally interested in any mines located or found, and in any lease taken by defendant and plaintiff. Defendant, without plaintiff's knowledge, took a lease in partnership with others. Plaintiff learned of the lease, and that defendant needed money to operate under it, but furnished no money and took no steps to obtain an interest in the lease until several months thereafter, when it had been discovered that the claim leased was a profitable one. Plaintiff testified that defendant had no power to lease property on his own judgment, but only to report propositions for leases to plaintiff, who was to examine the property and furnish the money. *Held*, that plaintiff was entitled to no interest in the property leased by defendant.

APPEAL from the District Court of the Second Judicial District of the State of Nevada, Washoe County; *B. F. Curler*, Judge.

Action by P. A. McKenzie against George Coslett. From a judgment for defendant, plaintiff appeals. **Affirmed.**

The facts sufficiently appear in the opinion.

*Mack & Farrington*, for Appellant:

I. After plaintiff had introduced about one-third of his testimony the court deliberately and arbitrarily discharged the jury. The action of the court was taken on its own motion and without any objection by the attorneys for the defendant, but it was strenuously opposed by counsel for

plaintiff, and when the order was made due exception was taken thereto. This action of the court was taken without cause; no reason or excuse therefor appears in the record. (Tr. p. 94, *et seq.*)

II. It is undoubtedly the rule that in an equity case the court may, within its discretion, grant or refuse a jury to try the issues of fact, and the right to trial by jury cannot be claimed unless such issues be specially framed for the jury under the direction of the court. (16 Cal. 249.) "Chancery courts are not to assume jurisdiction of a cause for the purpose of depriving parties of the right of a jury trial, but, once having taken jurisdiction because the case is one perfectly cognizable in a court of equity, the submission of issues of fact to a jury is a matter within the sound discretion of the chancellor. Even when a submission is made, the findings of the jury are to be regarded merely as made in aid of the chancellor." (3 S. W. 352; Ark.) It is a delicate matter to charge a judge with wilful abuse of discretion. Whatever may be the opinion of the supreme court in that respect in this case, this we insist upon with great earnestness: that there was not in this action by the lower court an exercise of sound discretion, but, on the contrary, there was the exercise of discretion purely arbitrary and capricious. It was, in our opinion, such an exercise of arbitrary discretion, as to clearly justify an appeal, and calls for a decided expression of disapproval from the supreme court. There is a distinction between sole discretion and sound discretion. We admit that it was in the sole discretion of the court to try this case with or without a jury. The exercise of discretion in that matter would not be appealable. But to refuse to try a case without a jury, and then, in the midst of the trial by jury, after new counsel had come into the case, discharge the jury, without cause—this is an abuse of discretion. If such a matter were in the sole discretion of a judge, he would arbitrarily discharge a jury, which he thought would probably decide contrary to his own views, and call another and discharge it in turn at his pleasure. The spirit of the law cannot be reconciled to such proceedings.

III. The attention of the court is called to the case of

*Norris* v. *Clinkscales*, 25 S. E. 801 (S. C). There it was said: " 'Discretion' should not be a word for arbitrary will or unstable caprice. Nor should judicial discretion be, as Lord Coke pronounced it, 'a crooked cord,' but rather, as Lord Mansfield defined it, 'exercising the best of their judgment upon the occasion that calls for it,' adding that 'if this discretion be wilfully abused, it ought to be under the control of this court.' (*Rex* v. *Young*, 1 Burrows, 560.) The courts and text writers all concur that by 'judicial discretion' is meant sound discretion guided by fixed legal principles. It must not be arbitrary or capricious, but must be regulated upon legal grounds—grounds that will make it judicial. It must be compelled by conscience, and not by humor, so that when a judge properly exercises his judicial discretion he will decide and act according to the rules of equity, and so as to advance the ends of justice." What was the discharging of this jury in the midst of the trial, under the circumstances in this case, and against the emphatic and continued protest of plaintiff's counsel, if not an act of "arbitrary will or unstable caprice?" And was it "exercising the best of his judgment upon the occasion that called for it" when the honorable judge discharged a jury without even an indication of reason or explanation for so doing? "Sound discretion is guided by fixed legal principles." What legal principles, pray, guided the honorable judge's discretion in his sudden and capricious action? "It must not be arbitrary or capricious." Was ever judicial discretion arbitrary or capricious if not in this case? What were the "legal grounds" upon which the lower court regulated its discretion? What considerations moved his "conscience" to do such a thing? What was it but "humor" that moved him; and is this "deciding and acting according to the rules of equity, and so as to advance the ends of justice" to refuse to try a cause without a jury, and then take the case away from the jury in the midst of the trial without any reason and in a manner which showed only arbitrary will, humor, and caprice?

*In re Norrington*, 13 Chancery Div. 659, it was laid down that "a discretion which is to be actively exercised must be exercised honestly and intelligently." The grounds for dis-

charging juries are such as these: Absence of jurors, misconduct of jury, inability to agree, jurors not coming to an agreement before end of term, illness or death. But in this case no grounds whatever were assigned for the action of the judge, nor were there in fact any reasonable or sufficient grounds for discharging the jury. So far as appears there were no grounds whatever for so doing. If the purposes of justice were to be subserved in any manner by the discharge of the jury in this case, we should have said nothing about this matter on this appeal, but, far from this being so, it is perfectly manifest that injustice, not justice, was done. (*Swink* v. *Bone*, 41 Pac. 838.)

IV. The court finds that on March 9, 1901, at Tuscarora, plaintiff and defendant entered into a partnership agreement, the purpose of which was to operate, prospect for, discover, locate, lease, and bond mines in Tonopah. Coslett was to give his time and attention to the business. McKenzie was to pay him forty-five dollars per month until the venture should become self-sustaining, the first payment to be in advance, and the others to be paid thereafter on the 16th day of each month, beginning with May 16th. Each party should pay half the expense, and the profits and losses should be shared equally. This was an express agreement which contains all the elements of ordinary partnership, and it is established by the findings of this court. The court concluded as matters of law:

(1) That plaintiff violated and abandoned this agreement by failing and refusing to go to Tonopah to secure the option on the Clifford mines. (Tr. p. 684.)

(2) That plaintiff violated and abandoned this agreement by failing, without cause, to make monthly payments. The payment of the forty-five dollars monthly was a condition precedent to any obligation on the part of the defendant to perform his part of the agreement. (Tr. p. 624.)

(3) That the plaintiff was guilty of laches in enforcing his claim.

(4) That no partnership for any purpose was actually launched, and the contract of partnership was merely executory.

(5) That there was no union between plaintiff and defendant in working the leased ground; that plaintiff did not contribute toward the working of the lease.

(6) That defendant abandoned the agreement by taking Atkins into the locations made and by subsequently entering into an active partnership with Stauts, Wilkerson, and Robbins.

V.  The finding that plaintiff wholly neglected, failed, and refused to comply with the agreement by refusing to go to Tonopah is not sustained by the evidence, and is not supported thereby.

VI.  The finding that plaintiff failed without cause to make the monthly payments of forty-five dollars is also unsupported by the evidence.  (Tr. pp. 18, 23, 620, 622, 623, 647.)

VII.  In view of the above the finding is that "in partnerships in the mining business one man cannot sit by and allow another man to make expenditures in the mining business and not fulfil his part of the agreement, and then, when the venture is shown to be successful, go in and claim his rights when it is apparent, as it is in this case, that if the venture had not been successful he would not have been heard from." While McKenzie was lulled into inactivity by Coslett's letter of April 24th and the Clifford samples, no laches can be imputed to him.  (*Kelley* v. *Boettcher*, 85 Fed. 63.)  It is only when, in cases of this sort, the delay is without excuse and prompted by a desire to see how development work will affect the value of the mine that laches will be imputed to the plaintiff.  (*Curtis* v. *Laken*, 94 Fed. 256.)  If the bar of the statute is applicable to a suit, but that has not intervened, delay alone will not bar the action unless it be shown that the defendant has been prejudiced by being lulled into security thereby.  Coslett was not prejudiced nor was any attempt made to show that he was.  (18 Ency. of Law, 2d. ed. 104, and cases cited.)

The lease in these matters referred to was acquired with partnership funds and capital and is therefore partnership property.  In *Waring* v. *Cram*, 12 Mg. Rep. 280–285, it is said that the common fund or capital of the partnership

may consist of labor and skill as well as money, goods, or other property; and if one of the partners employs the partnership property or effects, he must account to the partnership for the profits. The existence of the partnership does not depend upon the fact that each party had in all things complied with the agreement. If the contract has been made, property and labor contributed, and the partnership business commenced and carried on to any extent, there is a partnership. And it is a partnership even though McKenzie did not send a check for forty-five dollars May 15th and during the subsequent months, and even though he did not pay one-half of the expenses. No demand was ever made by Coslett for the subsequent month's wages and expenses. (*Abbott* v. *Smith*, 32 Pac. 845; *Reed* v. *Meagher*, 9 L. R. A. 466, 24 Pac. 681; *Continental Divide M. Co.* v. *Bliley*, 46 Pac. 634; *Sears* v. *Collins*, 5 Colo. 492, 12 Mg. R. 400.)

VIII. The fact that Coslett took a lease with Stauts, Wilkerson, and Robbins does not deprive McKenzie of his equitable interest in said lease. Neither did the taking of Atkins into the mining locations terminate the partnership agreement. ·(*Abbott* v. *Smith*, 32 Pac. 843; 4 Colo. 567; *Raymond* v. *Johnson*, 61 Am. St. R. 908.)

IX. It is true that the partnership in this case could be terminated by Coslett at pleasure, but notice must be given to McKenzie. No notice was given in October after the lease was taken. The notice must be communicated and without fraud. The circumstances must show an absolute abandonment as to future enterprises; this is not shown by Coslett's letter of April 24th. That letter shows only a temporary stoppage of prospecting, while Coslett worked (for wages), to be resumed later. (*Abbott* v. *Smith*, 32 Pac. 845; *Marston* v. *Gould*, 69 N. Y. 224; *Howell* v. *Harvey*, 5 Ark. 270; *Fletcher* v. *Reed*, 131 Mass. 313; *Chadbourne* v. *Davis*, 13 Pac. 721; 11 Lindley on Partnership, 571; George on Partnership, 395.)

X. Even if the partnership is terminated, it could not be terminated so as to interfere with rights and equities which had already accrued to McKenzie. (*Eagle* v. *Bucher*, 12 Mg.

Rep. 334; *Lawrence* v. *Robinson*, 4 Colo. 567.)   The court erred in refusing to find that, after acquiring said lease, defendant sent a lot of worthless samples of ore to plaintiff at Tuscarora, and also in refusing to find that said samples arrived in Tuscarora just as plaintiff was about to set out for Tonopah in obedience to Coslett's previous request, and in refusing to find that lease No. 30 included but one hundred feet in length along the Mizpah vein and the adjoining leases on each end of the above-mentioned lease were showing large quantities of valuable ore, for the reason that said requested findings were supported by the evidence and tended to show the fraudulent design of the defendant to prevent plaintiff from going to Tonopah and insisting upon his rights in the lease.

XI.   The court erred in sustaining defendant's objection to the following question propounded by the plaintiff: "Question by Farrington—In that conversation in relation to the agreement on your part, as you testify, not to prosecute the suit, was there anything said about what his testimony would be?   A.—Yes, sir.   Q.—What did he say?   Mr. Cooke—That is objected to on the ground that it is incompetent, irrelevant, and immaterial, and not proper redirect examination, and that it is hearsay.   The Court—The objection is sustained.   Mr. Farrington—We take an exception to the ruling of the court for the reason that the conversation was drawn out by the defendant on cross-examination—a portion of it—and we are entitled to the remainder of it." Said ruling was an error for the reasons set out in the exceptions.

XII.   The court erred and abused its discretion in discharging the jury herein.   The jury had been selected, impaneled, and sworn to try the cause, and had heard a portion of the evidence, and no sufficient reason was given for the discharge of said jury.   It was an abuse of discretion, preventing plaintiff from having a fair trial.   The order of the court violates the right of plaintiff to a trial by jury. Said jury was discharged by the court without the consent of the plaintiff.

*Cooke & Ayres*, for Respondent:

I. Much of counsel's brief is devoted to an attempt to show the lower court guilty of an abuse of discretion in discharging the jury, and on page 12 of their opening brief they say: "The court deliberately and arbitrarily discharged the jury." The statement is incorrect as is shown. (Tr. pp. 95–99.) The facts partially disclosed by the transcript, and which moved the court to discharge the jury, are that counsel ·for defendant insisted on the jury being kept together; that the court house and jury apartments were then undergoing or about to undergo repairs, and were totally unfitted for occupancy, etc. The court assigned no special reason, thinking, no doubt, that the unreasonable conduct of counsel under the circumstances and the conditions as they existed with reference to the great hardship and probable irreparable damage with jury was sufficient reason. The second ground, that the right to a jury is guaranteed by the constitution, is entirely too broad and therefore inaccurate as far as the same is attempted to be applied to the case at bar. The authorities are all to the effect that the right to a trial, as phrased in the constitution, refers to the right of trial by jury as it existed at the time of the adoption of the constitution. (*State* v. *McClear*, 11 Nev. 39.) The common law guaranteed no right to trial by jury in equity cases, and on this point we deem it unnecessary to cite authorities. The action of the lower court in granting a jury, and because defendant made what, under the circumstances, was a most unreasonable demand, the court's discharge of the jury is certainly not as unreasonable or arbitrary as the action of the court in refusing to allow a jury, when defendant in person twice demanded one, but of such ruling this court in *Lake* v. *Tolles*, 8 Nev. 290, has used the following language, quoted approvingly: "There must be an action at law, as contradistinguished from a suit in equity and from a special proceeding, or a criminal action and an issue of fact joined therein upon the pleadings, before a jury trial can be claimed as a constitutional right." (*Koppikus* v. *Commissioners*, 16 Cal. 249.) The general rule is stated to be: "The constitutional guaranty of the right of trial by jury does not extend

to the trial of equity causes; and the legislature may provide that all cases in equity shall be tried without the intervention of a jury." (6 Am. & Eng. Ency. Law, 2d ed., p. 975, note 3; p. 976, and cases cited in foot notes; 31 Cent. Dig. Col. 202, secs. 35–83; see, also, 31 Cent. Dig. Col. 205, sec. 39, and cases digested.)

II.   The two principal propositions upon which the court based its decree in favor of defendant are:

(1) That the arrangement or agreement entered into between plaintiff and defendant was an executory agreement to become mining partners;

(2) Gross laches on the part of plaintiff in asserting his claim of interest, if any he had.

The first proposition necessarily presupposes a finding that there was an agreement between plaintiff and defendant to become partners in respect to leasing.   This was specifically denied by defendant, and the evidence in support of plaintiff on that point is conflicting and utterly unsatisfactory from any standpoint.   In a case like this it is not enough that the plaintiff prove his case by a mere preponderance of the evidence, but that his case must be proven by evidence so satisfactory and convincing as to leave no reasonable doubt, or, as some courts have expressed it, to banish all reasonable doubts from the minds of the court.   In support of our contention that a mere preponderance of the evidence is utterly insufficient to entitle plaintiff to recover in a suit of this and kindred forms, we quote from a case where the facts were very similar to those in the case at bar.   (*Rice* v. *Rigley, et al.*, 61 Pac. 290 (Idaho); Pom. Eq. Jur., sec. 1040, and cases cited in notes; *Mitchell* v. *O'Neale*, 4 Nev. 504, 514, 515; *Frederick* v. *Hass*, 5 Nev. 389, 394; 47 Cent. Dig. Col. 688, sec. 137, and cases there digested.)

III.   That the point that plaintiff's complaint is devoid of equity, and that in such cases the objection to the same is treated as the objection ordinarily spoken of, namely, that the pleading does not state facts sufficient, etc., we cite *Bell* v. *Hudson*, 14 Pac. 793 (Cal.): "Laches deprives the plaintiff of the right to appeal to a court of equity, and the court may refuse to entertain a suit brought after unreasonable delay,

although defendant has not in his answer alleged that the claim is stale. (*Harris* v. *Hillegass*, (Cal.) 4 Pac. 987.)" That laches need not be pleaded is established by the Supreme Court of the United States. (*Sullivan* v. *Railroad Co.*, 94 U. S. 806; Rose's Notes, vol. 9, 197, where doctrine of the principal case was applied, approved, etc., in exhaustive note.)

IV. The complaint is fatally defective in our opinion in another particular. After proceeding to state facts which clearly establish, *prima facie*, a mere executory agreement between plaintiff and defendant to become mining partners in locating and leasing mines and operating same, the complaint proceeds to show affirmatively that in truth and in fact such agreement was never executed and the partnership launched. It was the defendant alone who acquired an undivided leasehold interest, etc., in and to the mining premises in dispute, and it is affirmatively established that plaintiff never joined or coöperated with the defendant in the working of the lease, and that it shows the defendant took the lease in his own name and worked the same independently of and in hostility to the plaintiff and plaintiff's alleged claim. (*Prince* v. *Lamb*, 60 Pac. 691.) It is true plaintiff himself alleges this in substance when he charges defendant with fraud, etc., in connection therewith, and the effect of all of this is that the complaint itself shows a condition of things on which a court of equity cannot take hold in this form of action. (*Johnstone* v. *Robinson*, 16 Fed. 905.)

V. We believe the case of *Prince* v. *Lamb*, *infra*, to be in point here. There the defendant received fifty dollars from plaintiffs under an agreement whereby defendant was to go to Alaska to prospect for and acquire and work mines jointly for himself and plaintiffs. Defendant went to Alaska, located mining claims there, and in pursuance of his contract wrote to plaintiffs to "come there and assist him in accordance with the agreement." Plaintiffs received this letter and went up as soon as possible to Alaska, but defendant then refused to allow them to stand in interest with him or participate as he had at first agreed. Of this the court, on page 691, says: "It appears that the defendant refused to carry out or execute this agreement for working the mines together, and therefore

no mining partnership was actually perfected." (*Prince* v. *Lamb*, 60 Pac. 690.)

VI.   Concluding this phase of the matter, we submit the complaint shows gross apparent laches wholly unexplained or unexcused away, and that it shows affirmatively that no partnership of any kind was actually perfected or launched, and, admitting the facts as alleged, plaintiff cannot maintain this action, but his remedy is at law for damages for a breach of contract.

- VII.   The finding of the lower court as to agreement was in effect an agreement to become mining partners.   The relations between Coslett and McKenzie could not be a grub-stake, as that simply means cotenancy without power in field partner to work the mines further than perfect location.   He is without power to contract debts binding on home partner or cotenant.   Besides, it is essential to a grub-stake that the "property be acquired by means of the grub-stake and pursuant to the grub-stake contract."   "Several parties grub-staked a man to go to Alaska to prospect for mines on shares. His authority to work such mines was not clearly proved. When his funds were exhausted, he borrowed money for further prospecting and sought to make his associates in the contract liable as partners.   It was held that there was no such partnership relation as would confer upon the prospector an implied power to bind his associates in the debt contracted." (2 Lindley on Mines, 2d ed., sec. 799, citing *Hartney* v. *Gosling*, (Wyo.) 68 Pac. 689.)

VIII.   The evidence and finding of the court is to the effect that the defendant had no power to contract debts binding on the plaintiff and that the lease was not acquired by means of the forty-five dollars, nor in pursuance of the agreement, but in violation of it, hence there can be no grub-stake relationship, and besides, if there were, this action could not be maintained, as cotenancy does not affect partnership.   The relation cannot be a special or limited partnership, as none of the requisite steps are shown to have been taken. (Sec. 2773, *et seq.*, Comp. Laws. Nev.)

IX.   The general rules providing what constitutes a mining partnership are also declared by Lindley.   "Where several

owners unite and coöperate in working a mine they form what is termed a mining partnership, which is governed by many of the rules relating to an ordinary partnership." (2 Lindley on Mines, 2d ed., sec. 796.) "A mining partnership exists when two or more persons own or acquire a mining claim for the purpose of working it and extracting the mineral therefrom—actually engage in working the same." (Id., sec. 797, note 2.) Where parties took a lease on a mine and coöperated in the working of it it was held they were mining partners, notwithstanding they did not own the mine, but the rule of coöperative working of the mine as essential to making them mining partners was clearly recognized and applied. (Manville v. Parks, (Colo.) 2 Pac. 212.)

X. We submit the authorities abundantly establish the proposition here contended for by respondent that a mining partnership consists of two essentials: (1) Two or more parties owning or acquiring a mine for the purpose of working it to extract the mineral therefrom. (2) Actually uniting in working the mine together for the purpose of extracting the mineral therefrom. If either of these essentials are absent, and particularly the last, we contend that there can be no mining partnership regardless of the agreement, as, until work is begun by or on behalf of the parties, the agreement remains executory and unconsummated, and on this point we cite: Anaconda M. Co. v. Butte M. Co., (Mont.) 43 Pac. 924–6; Nolan v. Lovelock, 1 Mont. 224.

XI. The whole case, pleadings, testimony and evidence and conduct of both parties show conclusively no consumation of the agreement. If the blame for this rests with McKenzie, he is, of course, entitled to nothing in any form of action. If the blame rests with Coslett, then McKenzie has simply mistaken his remedy, and, instead of a suit in equity for dissolution of something that does not exist to be dissolved, his action would be in law for damages. (Prince v. Lamb, 60 Pac. 690; Powell v. McGuire, 43 Cal. 11; Johnstone v. Robinson, 16 Fed. 905; West v. Russell, 16 Pac. 382; Storey on Part., secs. 269, 274, 277, 290; Meagher v. Reed, 24 Pac. 685; Groves v. Tallman, 8 Nev. 180.)

XII. The lower court found that the money represented

by the $45 check was exhausted long before Coslett took the lease, and, as matter of fact, long before he arrived at Tonopah, and that the few tools which Coslett had secured through McKenzie from the Dexter blacksmith shop had been either lost, misplaced, or otherwise disposed of prior to taking the lease, so that nothing furnished by McKenzie was actually used on account of the lease. But it is argued by counsel that the check itself, being credited in ɔn a bill against the lease some days before June 1st, shows McKenzie contributed to the lease expense. The answer to this is that if McKenzie is telling the truth in his complaint and testimony the check belonged absolutely to Coslett as his first month's "half-wage" to April 15th, and, if so, it can in no way affect McKenzie's rights as to what the check was directly applied as it was Coslett's money and he could do as he pleased with it. Either this is correct or McKenzie's whole case must fall. He cannot claim in one breath to recover on strength of "half-wage" agreement and then to say in substance in the next breath that, if the court disbelieves his story on that point, to allow his claim on strength of actual application of the check. In *Raymond* v. *Johnson*, 61 Am. St. Rep. 908, the parties formed a prospecting agreement. Both went out in pursuance of it and worked together. Raymond prospected one side of a hill while Johnson prospected the other side. On the other side of the hill Johnson found a mine, and falling in with one Whitcomb located him in and excluded Raymond, who all this time was industriously and diligently prospecting on the opposite side of the same hill. The court found the location of Johnson's was made while the agreement existed and while both were acting together under it, and that Johnson, in order to cheat and defraud Raymond, had made a conveyance and a bond of his interest without knowledge or consent of Raymond, and Raymond under those facts was decreed to be an owner of an undivided one-half of Johnson's interest in proceeds of conveyance and bond. The only defense set up was the statute of fraud. Partnership, abandonment, etc., was not an issue at all. The court simply held that the statute of frauds did not apply as the mine was located while the agree-

ment existed and both parties engaged in work under it. If defendant in the case at bar were urging the statute of frauds as a defense the case *supra* might be in point. Counsel says that the "fact that forty-five dollars is a small sum of money cannot avail the defendant." This statement is not borne out by authority. (*Prince* v. *Lamb*, (Cal.) 60 Pac. 690–2.)

XIII. On April 12, 1901, Coslett acquired the lease. The amount represented by McKenzie's check had been spent a number of times over, prior to this date. Coslett and his colessees continued working the ground. The undisputed evidence and facts are that the same ground had been formerly worked by others, who failed to find ore after doing considerable work and abandoned it. It is further shown that Coslett and colessees had practically nothing when they started work, which condition continued until returns came, which was August 20th (August 10th given as date in finding is clerical error; see Tr.); that during this time they borrowed and made shift as best they could; that finally things became so desperate that one, at least, had to quit work on lease and work for wages; that at this time it was practically decided to quit the lease altogether. This was shortly before June 1st. Ore was found first about June 1st. From then on an average of fifteen men (Tr. pp. 292–7) were employed at wages of four dollars per day. Tools, powder, fuse, etc., were approximately twice as high there as elsewhere in the state. The lessees were compelled to go into debt, borrow money, strain their individual and collective credit to carry on work. (Tr. pp. 110–112.) We think evidence shows the lease did not become self-sustaining even on August 20th, as returns were insufficient to pay back debts for some time after. From April 12th to January 16th of next year plaintiff made no assertion of his alleged rights. The conditions in Tonopah at that time were such that anyone having any sort of a claim, if acting in good faith, would have not neglected it. It is no excuse for McKenzie to blame Coslett for not notifying him. Laches is excused only by acts of positive fraud or concealment amounting to fraud. Besides it is plaintiff's laches and not Coslett's which here affects his right of recovery. But even if such were shown here, unless

plaintiff can show further that he asserted his rights, etc., within a reasonable time after discovery, McKenzie could not be deceived in any event after May 1st when he learned from Sewell that Coslett was in a lease and hard pressed for money. Besides, if Coslett had any object in deceiving McKenzie he would have done or attempted doing so just before or when he took the lease. Instead of that, two days before taking the lease, he writes that Tonopah was a wonderful camp; "I wish you were here. If you can do anything you had better come on." If Coslett had realized on April 24th the necessity of protecting himself by deceiving McKenzie, he must have realized it to the same extent on April 12th, and so arranged by waiting three days until his alleged "half-wage" month was over, or by having his interest in the lease taken in the name of some third party, which expedient is quite common; that he could have waited three days or three weeks is certain, as there was nothing of bonanza feature about the lease.

XIV. The feature of an unlettered and ignorant prospector like Coslett going down into a desert without stationery and making duplicate bills to one who furnished a $45 check as against Coslett's time, outfit, supplies, wagon, etc., is so unreasonable that it deserves ridicule rather than argument. But when McKenzie went to Tonopah, ostensibly to pay bills, it was in reality to find out if the lease had produced enough to pay him to sue. Instead of paying bills he industriously devoted his time to finding out from Oddie, *et al.*, how much Coslett's interest had produced. The proper construction of contractual relations are radically different in proportion as to whether the subject-matter will or will not pay, according to plaintiff's logic. It was about this time that McKenzie made his unhallowed and unholy bargain with Stauts whereby Stauts was to furnish or aid McKenzie with testimony against Coslett, and in return McKenzie was to aid Stauts in another case in which a receiver had been appointed over the same lease, etc. Then after this miserable transaction equity-seeking McKenzie goes home to Tuscarora, and the next we hear of him he procures the appointment of another receiver for property he knew to be already in the

hands of a receiver, for the purpose and object, as we view it, of squeezing Coslett into submission and compromise. Summed up, the facts, evidence, and conduct of McKenzie conclusively show that he intentionally kept in the background and allowed defendant to go on and make expenditures in the lease operations and struggle along as best he could from April 12th to August 20th. The one-half expense arrangement really dated from March 15th, the lease expenses from April 12th, the "half-wage" feature from May 16th to August 16th, at least. McKenzie's action in saying nothing and, worse still, in doing nothing during this period operated to mislead and deceive Coslett, and, to quote from counsel's brief, paraphrasing, McKenzie is "required to use the utmost good faith in his dealings with Coslett. He will not be permitted to pursue a course of conduct which conveyed the idea" that he claimed no interest while lease was precarious, and then complain that Coslett denies his right to participate in the profits made exclusively by the courage, efforts, and enterprise of Coslett. The seventh finding of the court is amply supported by the evidence of McKenzie's own conduct, independent of the testimony, and the conclusion of law is likewise supported by the most respectable line of authorities. "A court of equity will not aid in enforcing stale demands where the party has been guilty of negligence and has slept upon his rights." (*Godden* v. *Kimmel*, 99 U. S. 201; *Piatt* v. *Vattier*, 32 U. S. 405.) As this rule is elemental, we deem further citation unnecessary. "A party shall not claim the benefits or aid of a court of equity who has been guilty of laches in protecting his rights unless that laches may be imputable to the party claiming against him." (*Dickerman* v. *Burgess*, 20 Ill. 266.)

XV. Laches is not a technical defense. It goes to the merits of the cause, or, as some judges have expressed it, "to the very vitals" of the action. As a defense it is as old as the English court of chancery from which we derive our equity jurisprudence. Lord Chancellor Camden, in speaking of the application of laches, used the following language which has been used again and again by the Supreme Court of the United States and by text writers without quotation

marks: "A court of equity is never active in giving relief against conscience or public convenience, and has always refused its aid to stale demands whenever a party has slept on his rights and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence. Where these are wanting the court is passive and does nothing. Laches and neglect are always discountenanced and, therefore, from the beginning of this jurisdiction there has always been a limitation to suits in this court. It is because laches goes to the very merits of this action that whenever and however its existence is manifested to the court a court of equity will treat it as a bar to the granting of equitable relief. Hence, if laches appear on the face of the bill, the question may be raised on demurrer." (*Badger* v. *Wall*, 2 Wall. (U. S.) 806; *Hinchman* v. *Kelly*, 54 Fed. 63; *Curtis* v. *Laken*, 94 Fed. 251; *Bell* v. *Hudson*, (Cal.) 14 Pac. 791.) The laches in *Curtis* v. *Laken* was of about one year's duration and under circumstances far more excusable than in the case at bar, and, besides, plaintiffs there excused themselves on the ground of a partnership agreement lost for some time, and suit could not be safely maintained without this document. "Other classes of real property are comparatively stable in value and can be used and made productive at a comparatively small expense, but not so with mines. They are often only made to 'pay' by the expenditure of vast sums of money, and by this are sometimes changed from worthlessness to a value of many thousands of dollars. It is only justice that the holders of claims against this class of property should be required to assert them at an early day, to the end that they may not, in recovering their own, also reap too large a benefit from the enterprise of others." (*South End M. Co.* v. *Tinney*, 22 Nev. 36.)

XVI. The principle laid down in the case *supra*, that a mere assertion of a claim, unaccompanied by any act to give it effect, will avail the party nothing as against laches, has been recognized and approved by the Supreme Court of the United States, in the following language: "The excuse of the delay is that complainant protested against Casilear's

claim, and notified him that he would not submit to the sale; but the mere assertion of a claim, unaccompanied by any act to give it effect, cannot avail to keep alive a right which would otherwise be precluded." (*Mackall* v. *Casilear*, 137 U. S. 556; 11 Law Ed. 178–182.) That "assertion" of a claim means "asserting his right before the court," see 18 Am. & Eng. Ency. Law, 2d ed., p. 106, note 2. These authorities, in our opinion, effectually dispose of the contention of the learned counsel for appellant here that the language of McKenzie to Coslett in October, 1901, "where is my interest?" or "what interest have I got in the lease?" was an assertion of his claim. The "assertion" in fact was not made until January 16, 1902, when suit was filed, and hence his laches continued from even before beginning of lease until after its close. If there could be a grosser or more flagrant case of laches on a mining lease having the limited time of the one here, we confess we are unable to imagine it, and, even if McKenzie had purposely sought to make his laches as gross as possible, we are unable to suggest anything he could have done to make it so in addition to his course in this case. But, so far from McKenzie's actions here prior to suit being filed constituting an "assertion" of his claim, it has been held: "The mere institution of a suit does not, of itself, relieve a person from the charge of laches, and, if he fail to prosecute it with diligence, the consequences are the same as if it had never been instituted." (*Johnston* v. *Standard M. Co.*, 148 U. S. 371; 13 Law Ed. 585.)

XVII. That plaintiff's remedy, if any he has, is not in equity for a dissolution and accounting, but at law for damages for breach of contract. That plaintiff was guilty of gross laches, totally unjustified, unexcused, and inexcusable, and that the same precluded his recovery.

XVIII. That the findings of the court, excepted to and complained of by appellant, are supported by the evidence, and that the conclusions of law are supported by the authorities.

*Mack & Farrington*, for Appellant, in reply:

I. The granting or refusing a jury trial in an equity case

is a matter of discretion.   This is not an arbitrary discretion.
It is a legal discretion.   The court is bound to exercise this
discretion reasonably and properly.   An abuse of this discre-
tion is ground for appeal and is a matter which should be
reviewed in the appellate court. (*Townsend* v. *Graves*, 3 Paige,
457; *Belknap* v. *Trimble*, 3 Paige, 601; *Harris* v. *Mackintosh*,
133 Mass. 231; *Setzer* v. *Beale*, 19 W. Va. 289.)

II.    It is a very familiar rule that a trust in land cannot
be created except by an agreement in writing, or, in case
there be no agreement in writing, by parol evidence where
the agreement has been partially executed.   The evidence
must be clear and convincing as to the existence and the
terms of the contract.   "It is not necessary that the contract
should be proved with that degree of moral certainty which
is termed beyond a 'reasonable doubt.'   It is sufficient if the
subject-matter and the material terms of the contract can be
determined with reasonable certainty from all the evidence.
If the court can ascertain from all the proofs what the con-
tract really is, he must decree its execution.   It is plainly the
habit of the English courts, when a part performance has
been fully made out, to establish the contract, if it can pos-
sibly be done, although the evidence may be quite conflicting
and even uncertain." (Pomeroy, Specific Performance, sec.
137.). The rule goes no further than to require clear and
convincing proof of the making of the contract and of its
terms.   The rule is not a blanket to be stretched over the
whole case; not one of the multitude of authorities cited by
the defendant so holds.   After the contract and its terms
have been clearly established, the remaining issues are to be
determined by the ordinary rule of preponderating evidence
in civil cases.   (See cases cited by defendant.)

III.    There is no allegation in the complaint that defendant
"took the lease in his own name," or that there was any
"disavowal or repudiation of plaintiff" when the lease was
taken; on the contrary, the allegations of the complaint are
"that defendant acquired an undivided lease-hold interest";
that the same "was so acquired in pursuance of said agree-
ment between plaintiff and defendant and for the use and
benefit of plaintiff and defendant," and that "said defendant

denies" (not denied) this plaintiff's right, title, and interest in said lease, and in the prayer for judgment, which is incorrectly quoted on page 31 of defendant's brief, the following language occurs. The brackets include the language omitted by counsel: "[The plaintiff herein prays that he have judgment against the said defendant;] that plaintiff is entitled to one-half of all the profits accruing and arising to that interest in said lease No. 30 which has heretofore stood in the name of said Coslett [or to which he is entitled] and to one-half of all the profits which now [have] or hereafter may accrue to said Coslett under and by virtue of said lease; that an accounting may be taken of the value of all ores taken out of said Mizpah vein by said Coslett [and his cotenants under and by virtue of said lease]." We challenge counsel to point out any allegations in the complaint which show that the plaintiff's cause of action accrued nine months, or any other number of months, or even one month, before the commencement of this action. There is absolutely no showing of laches on the face of the complaint. Counsel's premises are not only desperately precarious, but they are utterly false; and the only "irresistible conclusion" to be drawn from their argument is that neither they, nor either, nor any of them have ever read the complaint.

IV. The cause of action set out in the complaint is not barred by the statute of limitation. No laches appears on the face of the pleadings. It is therefore unnecessary to set out facts excusing any alleged laches. The burden is on the defendant, Coslett, to show by his answer and prove the facts which constitute the pretended laches. (*Boynton* v. *Haggart*, 120 Fed. 819–830; *Kelley* v. *Boettcher*, 85 Fed. 55–62; *Beckman* v. *Hudson*, 35 Fed. 3–11.)

V. The complaint does not show a mere executory contract. The complaint will speak for itself. We insist that it shall be interpreted, not by garbled quotations, but by an actual inspection and consideration of the whole document itself. It affirmatively shows that the parties agreed that a partnership should be formed for certain purposes and that in pursuance of said agreement the parties performed certain acts and proceeded to do the very things which they had

agreed to.   This does not constitute a mere executory agreement.   The portions of the complaint which counsel have so carefully omitted from their quotations show that the lease was taken in pursuance of the partnership agreement, not in hostility to it.   The whole of counsel's argument, from page 31 to page 39, inclusive, of his brief, being founded upon the premises which in their most essential elements have no foundation in fact, must fall to the ground.

VI.   The proposition that there could be no general partnership in the business of acquiring and working mines and leasing mines is certainly not lacking in novelty.   (*Congdon* v. *Olds*, 46 Pac. 262.)   The agreement between Coslett and McKenzie provided for the sharing of the profits and expenses. McKenzie was bound thereby to pay his share of the expenses. It was understood that he should pay such share whenever Coslett presented the bills therefor.   The agreement here certainly presents all the elements of a common partnership, including the liability of each partner for partnership obligations.   (*Decker* v. *Howell*, 42 Cal. 642; Barringer and Adams on Mines, 753; 11 Snyder on Mines, 1516–1549; 107, note, Cal. Code, 2512; 11 Lindley on Mines, 1567; *Abbott* v. *Smith*, 32 Pac. 843; *Lawrence* v. *Robinson*, 4 Colo. 567; *Hartully* v. *Gosling*, 68 Pac. 1122; *Stewart* v. *Adams*, 26 Pac. 971.)

VII.   The court found that there was an agreement to form a partnership.   The agreement contemplated that the parties should not only engage in business, but that they should share the profits and losses.   Such an agreement constitutes a partnership.   (*Sargent* v. *Collins*, 3 Nev. 264.)

VIII.   If this be regarded as a grub-stake contract, the plaintiff is entitled to recover, even though there was no joint working of the mine by Coslett and McKenzie:   (1) Because the lease was acquired April 12, 1901, four days before the first month's wages had been earned; Coslett's time belonged to the partnership; Coslett had never, at that time, notified McKenzie that the partnership was abandoned. (2) Because the $45 check—the identical money which was paid by McKenzie to Coslett—was used by Coslett to pay for the first supplies used on the lease.   The finding of the court that Coslett took the lease with his own means is misleading

because there is no testimony that the acquisition of the
lease cost anything except Coslett's time, which belonged to
the partnership. The finding of the court and the statements
of counsel to the effect that the forty-five dollars was fully
exhausted before Coslett took the lease are simply idle. The
very identical money paid by McKenzie to Coslett was used,
and the whole of it was used in acquiring and providing
the first supplies for the lease. The lease was acquired with
partnership time and labor and partnership money during
the continuance of the partnership and belongs to the part-
nership. (*Moritz* v. *Lavelle*, 77 Cal. 10, 11 Am. St. R. 229;
*Lawrence* v. *Robinson*, 12 Mg. R. 388; *Johnson* v. *Robinson*,
·12 Mg. R. 396; *Waring* v. *Cram*, 12 Mg. Rep. 280–285; *Har-
ris* v. *Hillegass*, 54 Cal. 463; *Craw* v. *Wilson*, 22 Nev. 389;
*Emery* v. *Mason*, 75 Cal. 222.) Grub-stake contract is a
partnership. (*Berry* v. *Woodburn*, 40 Pac. 804; *Abbott* v.
*Smith*, 32 Pac. 843; *Bulcher* v. *Mulverhill*, 12 Mg. R. 350;
*Lawrence* v. *Robinson*, 12 Mg. R. 395; 4 Colo. 567; *Welland*
v. *Huber*, 8 Nev. 203; 13 Mg. R. 363.)

IX. Counsel's "fatal objections" to this contention are
threefold (Brief, 46, 15), to wit: First, their relation in
these claims were simply tenants in common until, in the
language of Judge Bigelow, "they engaged in working the
property to extract mineral." In the case of *Vietti* v. *Nes-
bit*, 22 Nev. 396, referred to by counsel, Justice Bigelow
says: "There was no such association of the individuals,
either intentional or unintentional, as would constitute a
firm. In fact there seems to have been no association of
them whatever. The only relation was the accidental one
that they owned undivided portions of the same property.
There was no agreement to do business jointly and no com-
munity of interest." Of course, under such circumstances
Justice Bigelow could not do otherwise than hold the parties
cotenants. In the case at bar Coslett and McKenzie had
entered into a partnership agreement for the purpose, among
other things, of acquiring and locating mining claims and in
pursuance of that agreement Coslett acquired a two-thirds
interest in four claims. These claims were partnership
property. (*Waring* v. *Cram*, 12 Mg. R. 286; George on

Partnership, p. 120, note 82; *Dorsey* v. *Newcomer*, 53 Pac. 557; *Roberts* v. *Eldred*, 73 Cal. 397; *Hogle* v. *Lowe*, 12 Nev. 295.)

X.   Secondly, Coslett and McKenzie never did actually engage in working these claims together or otherwise.   No authority can be found which will hold that property obtained with partnership money ceases to be partnership property because the owners do not work it jointly or together.   Counsel's position cannot be correct, unless it be true that there can be no partnership for acquiring, leasing, locating, working, and developing mines except there be an actual working of the mines by both parties.

XI.   A partnership at will continues until it is dissolved by the act of one or both of the parties.   (*Spears* v. *Willis*, 45 N. E. 849, 151 N. Y. 443.)   In order to dissolve the partnership Coslett should have given a clear and explicit notice of his intention to abandon and terminate the relationship. (See appellant's opening brief, p. 27; *Eagle* v. *Bucher*, 12 Mg. R. 334; *Crawshay* v. *Maule*, 11 Mg. R. 230; 11 Snyder on Mines, sec. 1604.)   In a partnership at will either party may withdraw when he pleases, provided he acts without fraudulent purpose and in good faith and at a reasonable time. (*Fletcher* v. *Reid*, 131 Mass. 313; *Howell* v. *Harvey*, 5 Ark. 270.)   It is not good faith when one of the partners at will dissolves the partnership in order to appropriate to himself profits, advantages, or property which should go to the firm. (*Howell* v. *Harvey*, 5 Ark. 270; 11 Lindley on Partnership, 572.)

XII.   Counsel says Coslett's evidence shows that he sent a distinct notification to McKenzie cutting loose from McKenzie.   (Brief, 58, 18.)   With all due respect to counsel we must say it shows the contrary.   An examination of the peculiar testimony of Coslett in relation to the letter makes it in the highest degree probable that he never wrote any such letter. He was never able to give any testimony in relation to the letter which was not contradictory, and the court finds that he never wrote such a notice as he claims to have written on April 7th.   (Tr. 650, 14 and 66, 21.)

XIII.   While McKenzie was lulled into inactivity by Coslett's letters and the worthless Clifford samples, no laches

can be imputed to him. The conversation with Sewell and Messimer did not lead him to doubt his partner. The evidence is that McKenzie refused to believe or suspect that he was attempting to defraud him, especially in a case like this where the confidential relationship of partners existed. Laches does not begin to run until discovery of the fraud, but suspicion is not knowledge. The suspicion may call for investigation, but it is not knowledge. McKenzie talked with Sewell, but thought there must be a mistake. He talked with Messimer early in June, but placed little reliance in what he heard. (See Tr. 139; *McKneely* v. *Terry*, 33 S. W. 953, 958; *Marburg* v. *McCormick*, 25 Kan. 38–43; *Kilbourn* v. *Sunderland*, 130 U. S. 505–519.) It must be remembered that this case does not involve equities or rights of third parties; it is simply a question of liability between the original parties. The relation between the parties is that of partners—a confidential and fiduciary relation. McKenzie was justified in being slow to believe wrong of his partner. (*Champion* v. *Woods*, 12 Am. St. R. 128.)

XIV. The relation of Coslett and McKenzie is a partnership. Coslett held a one-third interest in the lease as a partner. This was an express trust, and it is presumed to continue until it is repudiated, but when the trust is repudiated and the knowledge of the repudiation is brought home to the *cestuis que trustent*, then the doctrine of laches will apply. This repudiation did not occur until the last of October, 1901. (*Curtis* v. *Laken*, 94 Fed. 255; *Naddo* v. *Bardon*, 51 Fed. 493–498.) McKenzie cannot be held to be guilty until after the partnership was dissolved. The requisite notice to dissolve was not given until October, 1901, when McKenzie met Coslett in Tonopah. (*Harris* v. *Hillegass*, 54 Cal. 463–468.)

XV. Laches does not apply when the defendant has acted in open hostility to complainant's rights and has not been led by apparent acquiescence on the complainant's part. In such a case no consideration of good faith requires that the plaintiff should open the legal warfare at the earliest opportunity; when a hostile attitude is taken the complainant is expected to be wary and deliberate in choosing his oppor-

tunity.   Coslett was in no way prejudiced by the delay. (*Beale* v. *Chase*, 31 Mich. 533; *Ulman* v. *Clark*, 75 Fed. 872.)

XVI.   Laches cannot be successfully maintained as a defense when it appears, as in this case, that the defendant had contributed to the delay.   (*Richards* v. *Hatfield*, 40 Neb. 885.)   Where there has been no change in the defendant's position by reason of the delay, the doctrine of laches will not be applied.   In the case at bar there has been no change in Coslett's possession; he has incurred no expense which he would not have incurred if there had been no suit.   (*Gibbons* v. *Hoag*, 95 Ill. 69; *Morrill* v. *National Bank*, 173 U. S. 135; *Wheeling B. & L. Co.* v. *Bymann Brewing Co.*, 90 Fed. 194; *Hamilton* v. *Dooley*, 15 Utah, 292; *Newman* v. *Newman*, 152 Mo. 415; *Nudd* v. *Powers*, 136 Mass. 277, delay of three years; *Platt* v. *Platt*, 58 N. Y. 646, delay of seven years in bringing suit to set aside deed on the ground of undue influence; *Townsend* v. *Vandewater*, 160 U. S. 171–185, delay of nine years; *Park* v. *Bethel Hotel Co.*, 31 L. R. A. 713.)

XVII.   It is only when the complainant has slept on his rights so long that, if relief be given him, great and serious wrong will be done the defendant that laches will be a complete defense.   (*Daggers* v. *Van Dyck*, 37 N. J. Eq. 137; *Pacific R. R.* v. *Atlantic R. R. Co.*, 20 Fed. 289; *London and San F. Bank* v. *Dexter Horton Co.*, 61 C. C. A. 523, 126 Fed. 593.)

XVIII.   The court erred in finding that the payment of the forty-five dollars per month and one-half of the expense was a condition precedent to any obligation on the part of the defendant to perform.   The contract of partnership was entered into and the parties contributed money and labor thereto.   The partnership business, to wit, locating mining claims, etc., was commenced, hence there was a partnership properly and regularly formed.   (*Meagher* v. *Read*, 24 Pac. 692.)   Nor could there be any condition precedent to the carrying out of the purposes of the partnership.   If McKenzie failed to comply with his engagements Coslett had his remedy; he could have demanded performance, and when it was refused, he could have notified McKenzie that the partnership was at an end.   "A precedent condition is one which must

happen before either party becomes bound by the contract."
(Anderson's Dictionary.) "A precedent condition must happen
or be performed before the estate, right, or interest to
which it is annexed can vest or take effect." (*Söderberg* v.
*Crockett*, 17 Nev. 415.) It certainly cannot be maintained
that the payment of each installment of wages or each item
of expense is a condition precedent before either McKenzie
or Coslett is bound by the partnership agreement. If the
finding of the court is correct, Coslett would never be bound
by the partnership agreement until the last installment of
wages had been paid and the last item of expense incurred
and settled by McKenzie. (Plaintiff's opening brief, p. 25.)

XIX. Counsel for plaintiff asked of McKenzie the following
question: "If there had been any debts which they (Coslett,
Stauts, and Wilkerson) could not have paid, what would
you have done about it?" The court sustained an objection
on the ground that it called for a self-serving declaration
and was immaterial. It is proper for a party to testify as to
his intent. (1 Thompson on Trials, sec. 383; 1 Jones on
Evidence, sec. 167.) The materiality of the testimony is
shown by its bearing upon the question of laches and the
liability of the plaintiff for the debts of Coslett contracted
in operating the lease. The answer would have disclosed
how far McKenzie recognized his liability for such debts
and obligations.

By the Court, Belknap, C. J.:

This is an appeal from a judgment and decree in favor of
defendant in a suit for a dissolution of partnership and an
accounting of the proceeds of ores realized in operating a portion
of the Mizpah lode, in Tonopah mining district, under a
lease by defendant and others, from which plaintiff was
excluded.

The answer denied partnership.

The court found, among other things, that about the 16th
day of March, 1901, plaintiff was the superintendent of the
Dexter mine, at Tuscarora, and defendant was a miner in the
employ of the Dexter Company; that, intending to go to
Tonopah to prospect that country, he verbally agreed with

plaintiff to locate him in any mining claims he might discover, to send him samples of the ore of the principal mines, to inform himself concerning the opportunities for purchasing mining properties and advise plaintiff, and, if the information justified a personal examination, plaintiff would go there and make such examination. Plaintiff agreed to pay defendant wages at the rate of $45 per month, and on or about the 16th of March paid him $45 in advance. It was further found: "That each should be equally interested in any mines located or found, as well as in any bond, lease, or option taken by defendant and plaintiff, and should be undivided one-half owners in any claims located or discovered, or the profits of any bond, option, or lease taken or worked. That each should pay his proportionate share of the expense of such venture until it became self-sustaining."

The fourth, fifth, and seventh findings are, in part, as follows:

"That on or about April 12, 1901, defendant agreed to form, and did form, a partnership with T. W. Wilkerson, E. A. Stauts, and J. H. Robbins for the purpose of taking a lease on one hundred feet of ground of the Mizpah ledge, described in the complaint. That said parties at once began active work together in said leased ground under a lease from the owners of said Mizpah claim given to defendant, the said Wilkerson, Stauts, and Robbins. That the defendant acquired and took his interest, to wit, a one-fourth interest, in said lease, with his own means, in his own name, for his own use and benefit, and excluded plaintiff, whose name was not used or known in the said lease, or the negotiations that led up to the taking of the same. That defendant and the other parties named continued to work the leased ground until on or about May 12, 1901, when the interest held by J. H. Robbins was acquired by defendant, Wilkerson, and the said Stauts. That defendant, Wilkerson, and the said Stauts continued to work the leased ground for about one month and a half at heavy expense, being put to great strain for want of money to carry on the work, several of them stopping the work on lease to work elsewhere for wages wherewith to get money to support their families, as well as to carry on the work on

the lease.    That defendant entered into said partnership with the said Wilkerson, Stauts, and Robbins without the knowledge or consent of the plaintiff, and not in pursuance of any agreement, expressed or implied, with said plaintiff.

"(5)  *  *  *  That no ore was actually discovered in . said ground until on or about some time between May 28th and June 1st of that year.  *  *  *

"(7) That plaintiff became fairly and fully informed and advised of the fact that defendant was in said lease, and that defendant was being pressed for money to carry on the work and operations in said lease, at least as early as about the middle of May, 1901.    That shortly thereafter, and long prior to plaintiff's going to Tonopah, about November 1st of that year, plaintiff was repeatedly informed of defendant's being in said lease, and shortly after and on or about June 1, 1901, the time the ore was found in said lease, plaintiff was repeatedly informed and advised that said lease was a paying and profitable one.    That plaintiff made no assertion of claims of any right or interest in said lease, or the leased premises, or the proceeds thereof, nor made or asserted any claim of right or interest by reason of his agreement with defendant, until long after ore was struck in said ground, and until long after the lease was ascertained, beyond any doubt, to be a profitable one.    That the taking out of ore from said ground began about June 1, 1901.  *  *  *  That the first assertion of his alleged claim or interest was not made by plaintiff until November 1, 1901, or thereabouts, and that nothing was done by plaintiff to enforce his alleged claim in interest until the 16th of January, 1902, when the above-entitled action was commenced."

Plaintiff testified in part as follows:    "In the latter part of the conversation I told Mr. Coslett that, if he came across some good property that he could get a lease or bond on, to let me know, and, after my personal examination of it, that I would go down there and examine the property, and, after taking my own personal expenses and the money, whatever it was, that I invested, that we needed, divide the rest share and share alike—that we would divide the profits that way— but I said I would not entertain a proposition until I made a

personal examination myself." Upon his cross-examination the following occurred: "Q. You would not have taken hold of any property until you made a personal examination? A. No, sir; not until I made a personal examination. Q. You was to manage the deal and buy the property; Coslett was to do whatever you said? A. There was nothing said, exactly, about that. I was to use my own judgment about that. Q. Who was to put up the money for the bond? A I was. Q. You were to put up the money and take the bond on it if you considered it a good proposition, and, if you considered that it was not, you would drop it, using your own judgment about it? A. Yes, sir; I would take a bond if I thought it was all right, and if I didn't I would drop it. I was to use my judgment. Q. Then, no matter what Coslett did, you were to approve of it first, and, if it was not a good proposition, according to your judgment, you would abandon it? A. Well—— Q. You had the exclusive right to say as to whether the property was to be taken or not? A. Yes, sir; that was strictly understood." In defendant's narration of the agreement, he said: "Well, he [plaintiff] said he didn't want to bother with any leases, anyway; that he was too far away to tend to any leases, and that he didn't want to have anything to do with them; that all he wanted to be interested in was mining locations or claims, or jointly in bonds that I might see fit to take."

The words in the above-quoted finding, "That each should be equally interested in  * * *  any lease taken by defendant and plaintiff,  * * *"  must be taken in their literal sense; that is to say, plaintiff and defendant were not, in fact, interested in the lease. Defendant was. The above excerpts of the testimony of the plaintiff himself show that he was not to be interested in any lease until after examination and approval by himself. He was not informed by defendant concerning the mine or lease. Under plaintiff's version, it was defendant's duty to have informed him. But notice of the facts sufficient to put a prudent man upon inquiry could have come from any other source. The district court found as a fact that plaintiff was fully and fairly informed by others. Under these circumstances, considering

the uncertain value of the property, plaintiff should have promptly asserted his rights, and not have waited until defendant had developed the property and demonstrated its value.

It is unnecessary to consider other questions. The plaintiff's testimony and the findings upon the subject of notice precluded a recovery.

The judgment and order are affirmed.